May it please the Court, my name is Chris Landau and I'm here today on behalf of Raytheon. I'd like to reserve five minutes for rebuttal. This case turns on two key points. First, in addressing the subject of health care benefits, all of the collective bargaining agreements, or CBAs, at issue here expressly subordinate themselves to the ERISA plans so that you can't determine whether benefits have vested under the CBAs without reference to the plans. And second, each of the plans at issue here contains a reservation of rights provision giving the employer discretion to modify or terminate health care benefits, and these provisions preclude vesting as a matter of law. The district court here missed the first, the threshold point, by insisting that a plan can't take away rights that have vested under a CBA and thereby construing the CBA without reference to the plans. The problem with that approach, as we explained in our briefs, is that the CBAs at issue here themselves are replete with references to the plan, and they subordinate themselves to the plans in terms of the plan. Kagan. But they're replete, or there's this one sentence? Excuse me? Other than that one sentence, what do you mean by replete? And that's the point I was trying to make, Your Honor, that it actually is not just J-5, which we focused on, is the clearest provision. That's the one sentence I think you're referring to that says, all benefits are expressly subject. But if you actually go back to A, Section 13A of, let's say, the 1990 CBA, and we're obviously dealing with a number of different documents, but that's at ER 115. So Section A, when it says the comprehensive medical plan will be made available, and then right there in A it says the plan is subject to the terms, conditions, and exclusions in the plan documents. And then A-2, that was A-1, Your Honor. A-2 also refers to the plan documents. Then when you go to D, which is the part about retired medical benefits, D-2 also refers to the plan documents. Then when you actually go to J-1 and J-2, which is at ER 115, which is the part that the district court really relied on, where it says the employer agrees to pay the premiums for the comprehensive medical plan. Again, then it says open paren, subject to the provisions of Article 13, Section A, which is what I just mentioned, that itself says it's subject to the plan. So certainly the clearest manifestation of the subordination is in J-5, which is on that same page. But it's merely one of a number of references throughout these health care, throughout the section of the collective bargaining agreement on health care that refers to the plan. Does the plan, do any of these plans deal with the question of who pays the premium? Your Honor, the earlier plans do not speak to that. In other words, there's four plans at issue here, 94, 97, 99, and 03. In the later plans, the 99 and 03 plans, it says specifically that the contribution levels to the premiums shall be determined by the employer, and at the employer's discretion, it can be modified. I don't understand how that can be when the, and it just means that all these provisions of the collective bargaining agreements are just nulls. They don't. No, Your Honor. Just a minute, because I don't understand your argument to be in any way specific to the fact that these are retiree benefits. In other words, on your theory, the, with regard to active employees as well, the plan, the collective bargaining agreement is completely subordinated to the plan, and the plan makes the employer unilaterally responsible for everything. Well, Your Honor, the, again, this case does not involve the active employees. It defines the ---- Your argument, there's nothing about the argument that's retiree-specific. That is true, Your Honor. In fact, the plan defines the retiree benefits by the coverages to which they're entitled. We can talk about coverages in a second, by reference to the coverages for the active employees. And, in fact, in the Southern Nuclear case cited in our brief, the D.C. Circuit had a situation where it was involving active employees and a reservation of rights. And they said that that was okay. Your argument would be that with regard to active employees, although there was a collective bargaining agreement and there were negotiations over who was going to pay what for medical plans and life insurance plans and so on and rather extensive provisions, nonetheless, it's all a complete nullity because of this cross-reference which makes the employer able to terminate or do whatever they want. I guess, with respect, I wouldn't say it's a complete nullity. They have those rights presumptively, but you get that right with an asterisk. You get that right subject to the plan. So, in other words, it's you have to look at the collective bargaining agreement as a whole to determine what rights you get. And if the rights that you got have an asterisk that says subject to the plan and the plan, then, has a reservation of rights, then you can't go and say, well, in fact, you bargained for something that couldn't be taken away. In other words, it's still the same. But I want to focus on the act. It has helped me in evaluating this argument to see that it is not in any way retiree specific. Well, Your Honor, the only context in which it may be retiree specific is that the under the LMRA, there are, you know, health benefits or welfare benefits are a subject of mandatory bargaining. And so it is not clear to me under the LMRA that with respect to active employees, the employer could alter the terms. But that's like a that's a that would be an that limitation would come out of the LMRA and not out of the terms of the contract, not out of the CBA itself. In other words, it is possible that the employer during the terms of the collective bargaining agreement, again, this is hypothetical. It's not this case. But I'm trying to respond to your question, Your Honor. If the employer were to do that, it's possible the employer could not do that without bargaining. Again, that's the Southern Nuclear case from the D.C. Circuit. It's the closest case on point to that. Well, let me then move to a specific. And I don't know if there's two classes of employees or not. But if you go to the 99 plan, assuming it's incorporated by reference, the CBA incorporates it by reference. Sure. It then says in Article 8, Section 8.2, it talks about reserving this right unconditionally with respect to some or all of the employees. And then they tell you where you go for a definition of employee, which is a standard independent contractor employee divide. So the question then is that really, that language is in distinction to the 1994 and 97 plans, correct? Yes, Your Honor. Okay. So if that only applies to employees, where do retirees come in? Well, let me answer it this way, Your Honor. The 1999 and 03 plans, you're asking exactly the right question, which is already a question. I'd like to get the answer. No, I'm sorry, Your Honor. But the only point I was going to make there, Your Honor, was to say it's not the question that the district court asked. Of course, the district court never even got to this question, because the district court says I'm stopping on the CBA. We're saying, okay, you can't stop on the CBA, you've got to go to the plan. Now you're asking me, okay, I'm looking at the 99 plan and the 03 plan. Right. And there's three things that were done, and you've pointed to one of them. In Section 5.2 of the 99 plan, this is at ER 167, that's where it specifically says that the 5.2. Section 5.2. Okay. This is one of the three things that were done in the 99 plan. It says, Participants' contributions, if any, shall be determined by the company, and participants' contributions shall be subject to change and in the sole discretion of the company. That was one change. The second change was that the reservation of rights provision was broken into two different parts, 8.1 and 8.2. Your Honor just referred to 8.2, which is entitled right to terminate. Of course, this is not a situation of termination, since the plan has not been terminated. This case is actually governed by 8.1, which says the company reserves the absolute right to amend the plan and any or all benefits programs incorporated from here and from time to time, so that the argument was made by my friend on the other side that, with respect to 8.2, the right to terminate, which, again, is not at issue here because we're not terminating, that that is limited only to active employees. Again, you need not reach that question here because the relevant reservation of rights provision is in 8.1. The other thing I would say, Your Honor, that was done that's relevant in the newer plans, that really, again, makes vesting, it seems to me, quite clearly impossible in this situation, is that Section 9.2 was added, and that's at ER 170. And that one says, No participant or person claiming through such participant shall have any right to or interest in any benefits provided under the plan upon termination of employment, retirement, termination of plan participation, except as specifically provided under a benefit program, which itself, up in, I think it's 2.3 or 3.2, 2.3, yes. But that's the plan, not the CBA. The district court erroneously said that, except as specifically provided in a CBA, but it's actually, when it says benefit program, capital B, capital P there, it's referring to a plan, not the CBA. So, again, it's, when the plan says no vested right to benefits, it's just, it's hard to understand how, how, and the CBA, in turn, has this express subordination to the plan. Let me ask you about the express subordination. What it says is all benefits are subject in every respect to the terms of the applicable plan. Now, isn't the, the way I would read that, so as not to negate the collective bargaining agreement, is to say that the collective bargaining agreement deals with establishing certain plans and providing for who is going to pay what with regard to them, but the nitty-gritty of what benefits are available, you know, whether we pay for hospitals or doctors or whatever, is in the plan. And that would be the normal divide. You're trying to read it to say that everything about, about the provision of medical benefits, not just which benefits are provided, is going to be subject to the plan, and thereby essentially trump everything that's in the collective bargaining agreement and make it a nullity. I understand you don't think it's a nullity, but it seems to me it's a nullity. Let me try to address those in order and get to the nullity point, because that's really the nub of the case, and I hope I can persuade you that it's not. But if you were to say that all benefits in Section J-5, which is the express subordination provision, only refers to the content of the benefits and not to premiums, then there's a more fundamental problem with the plaintiff's position here, which is the way they get any — their theory of vested rights depends on the D-1 provision that says you shall get the coverages for which you were — you will continue to provide the coverages for which you were eligible while you were active. We've always taken the position that coverages back in D-1, which is their threshold argument, doesn't include premiums. It includes the risks for which you're covered. The district court disagreed with that, and all of this argument that we are making about the reservation of rights is all kind of assuming arguendo that they get their foot through the initial step that it's — that coverages includes premiums. It seems to me it would be a very strange reading to say that benefits doesn't include premiums in J-5, but coverages, which is a narrower word, if anything, than benefits, does include premiums. Benefits is a more generic term, Your Honor. Are you saying that coverages — you interpret coverage simply to mean the more detailed coverages of what's in your medical plan as opposed to who pays for it? Yes, Your Honor. And, in fact, I think that is buttressed by J-1 and J-2, which are the provisions that say we will pay for your premiums, because it says in J-1 and J-2, and this is at ER 119 again, the employer agrees to pay the premiums for the comprehensive medical plan subject to Article 13, Section A coverages. So it's contrasting premiums and coverages right there in J-1 and J-2. And, again, the crux of their argument is that they start out with D-1, which says the retirees until age 65 shall get the coverages for which they were entitled while active, and then it goes to determine what it was when they were active to J-1 and J-2, which, again, use coverages in a way that I think very strongly suggests that it does not include premiums. But, again, just going back to Judge Berzon's question, I think it's very hard to interpret J-5 narrowly, the all benefits, not to include premiums, but yet to read coverages in a way that does include premiums. So what do you get under your construction if you get the same coverage you got as an employee, but the company doesn't pay for it? You get the coverage, meaning the risks for which you're covered under the plan. You get a dental plan. You get these coverages. The right to participate in the group medical plan, which is a very valuable right, but that just the coverages itself doesn't address the payment issue. You get the ---- Is it like a self-administered COBRA, in effect, is what you're saying? Your Honor, I'm not sure I know enough about COBRAs to ---- Well, that's what COBRA does. It basically says you end your employment and you say, well, you get the same stuff, only now you've got to pay for it. Then I believe that the answer is yes, under that understanding. But just going back to Judge Berzon's question, because I think it's really a critical question here, which is the kind of approach that, well, doesn't, in effect, J-5 then and the reservation of rights provision render illusory the promises of, you know, the same coverage until 65. This is a recurring issue in these cases. I mean, this case is not by any means the first case where a so-called durational provision, a provision that says you shall get benefits for life until death until age 65, has to be reconciled with a reservation of rights provision. And what the courts do, what the courts have uniformly said, and they've said it's unambiguous, is that you presumptively get these benefits, it's a default rule that you shall get them, but the employer has given them with an asterisk, that they could be taken away. They're not illusory in the sense that you're presumptively entitled to them. But the presumptively. But what do you mean by presumptively? What does it get you, though? What does it get you? You get them until you don't. Well, you're right. That's what it should say here. Well, but that's what it does say here. In fact, if you look at, you know, J-1, where it says the employer will pay the premiums, a few paragraphs down in J-5, it says subject to the plan, which has a reservation of rights provision. And so the employer is saying, we're going to give you this benefit presumptively to the right to participate in the plan as long as we have one and under the conditions that are defined. But if you were to say that this vests and locks in the employer, and again, let's remember, we're talking about welfare benefits here, where this is all a matter of contract, there's no vesting via statute. Right. I mean, that's kind of an odd concept with health benefits as opposed to pension. Absolutely. Well, you're right, Your Honor. The word vesting. Right. But that's why vesting, you have to look to the agreement. And so what you have to do, you have the situation here where you have what looks like a durational, what is a durational provision until age 65 on the one hand, and then on the other hand you have a reservation of rights. It would be simple. I mean, there are a number of cases in which the collective bargaining agreement itself can be read not to provide for retiree health benefits beyond the limit of the agreement. Correct. All right. And that's not what we have here. So that's why there is more of a tension between the collective bargaining agreement and the purported incorporation of the reservation of rights than in the cases in which the collective bargaining agreement itself doesn't provide on its face for this 10-year period that benefits would be. It's actually a 10-year period. It's not more than that. Sure. It's not really life. It's 10 years. Right. But in some cases, Your Honor, it is life. In the Brushy Creek case cited in our brief, that's a Seventh Circuit case. The CBA said for life, and the Court said it was unambiguous when that had – when that was reconciled with a reservation of rights provision in the plan. Let me ask you one other question because your time has kind of run. I apologize. Actually, it has run. But I have a question, though. Is the – are the summary plan descriptions in the record? Yes, they are, Your Honor. They were attached below. And there are also some, I think, letters or information sent. Has extrinsic evidence been used in this case up to now, and why not? Some extrinsic evidence was submitted in connection with the summary judgment that you see below. But it hasn't been really analyzed. The district court expressly said, I think this is clear as a matter of law under the CBA, and I'm not even going to look at any of that stuff. Right. Because that was my next question, is that maybe it's not so clear, and it really does need, you know, some analysis of whether extrinsic evidence comes in. Is this plan is governed by what law? Federal common law, Your Honor. Federal common law. Yes, Your Honor. Which you probably is trying to do this in another case. So I'm just wondering what your position is on that. Well, certainly, Your Honor, we believe that it's unambiguous when you look at the cases cited at pages 34 to 35 of our blue brief. Those are all cases in which courts have reconciled durational language on the one hand, like you get these benefits for life or until death or until age 65 with the reservation of rights. But the problem is they don't really reconcile it. They just drop. Well, again, it says that that's the way they reconcile them, is to say, look, you get the benefit, but it's a benefit that is not vested. Again, the background rule is a nonvesting in this with respect to health care benefits, welfare benefits. So, and again, the one thing, the Brushy Creek case from the Seventh Circuit, 07, the Crown Court and Steele case from the Eighth Circuit in 07 are both situations where the CBA had this kind of language. One of them said for life. The other one, until death. And this Court itself in the Pisciata case had a court, which is a binding circuit precedent, said for your lifetime in the durational provision, but the Court held  it's for your lifetime unless and until the employer takes it away. As Judge Tashima said in the case. Why don't we do this? I think you've more than used your time. We'll give you some rebuttal time, but let's hear from. I appreciate that, Your Honor. Thank you very much. May it please the Court. My name is Robert Gregory. I represent the class of retirees who formerly worked for Hughes Aircraft Company and later Raytheon Company. I want to start with the beginning and end of this case as the appellants characterized it in their brief. They indicated that the beginning and end of this case is the reservation of right provision contained in the plans. So let's read the reservation of right provision. It says, and this is in ER 163, Raytheon intends to maintain the plan in force and effect indefinitely, but reserves the right to alter, amend, modify, revoke or terminate in whole or in part the plan except as provided in any agreement with a collective bargaining agent. There are two critical parts of this provision, the reservation of right provision. One is it says that Raytheon reserves the right to modify, amend, revoke, terminate the plan, not the collective bargaining agreement. Second, it makes the express exception except as provided in any agreement with a collective bargaining agent. No, but it's not right that this does not appear in the later ones. I'm sorry, Your Honor? Does this exception apply in the later plans? It's in the 1997 plan. But not the later one. But not in the 1999 plan, Your Honor. And that's the exact language that also was in the prior plans, 1990, 1994, that were enacted by Hughes and then adopted by Raytheon in 1997. Well, you know, here's one of my problems with the language, which, of course, was not drafted by the retirees or the employees. It's you have a collective bargaining agreement and you get all the benefits in that plan, excuse me, all the benefits in the agreement, including what's listed as a benefit plan. However, that is subject to the plan, the Big P plan, okay? Then you go to the Big P plan, which you just read from, and it says, but we can't reserve or modify anything except as provided in the collective bargaining with an agreement with the collective bargaining agent. But it just told you, if you go back to that CBA, that it was subject to the plan and it doesn't say that it can't be modified. So it's like this mobia loop, you know, and you're in this loop language that keeps going like this. I think what we used to call Renoir in conflicts of laws. It seems to be a circular drafting. And, of course, you're right. The retirees in the union did not participate in the drafting of the plan. That was a unilateral document prepared, incidentally, by the union after the collective bargaining agreements were negotiated and signed. But in any case, the subordination provision, and there's only one, by the way, and I'll get to that in a moment. But the subordination provision simply states, directs the parties, that the terms of the collective bargaining agreement are subject to the plan. Now, that does not affect retiree group benefits, and I'll explain that in a moment. Then in the plan, the reservation of right provision that Raytheon has absolute and unequivocal says at the end, except as provided in any agreement with the collective bargaining agent. That's the language that Raytheon has. Okay. So let's assume that you're right. That takes care of some of your employees. What about the ones who retired after? Now, I gather, by the way, that you are both assuming that the collective bargaining agreement that applies to any retired employees is the one in effect at the time that person retired. Correct. That's not self-evident to me, but that's a given, as we're taking. In other words, not the one that was in effect when he was working, but the one that was in effect when he or she retired. And that is the understanding of the parties. And that came out in discovery in this matter, but it wasn't a brief matter. All right. So assuming that, therefore, and assuming for the moment that the argument you just made works for the 90 and 97 retirees, what about after that? Well, if we look to the language of the 1999 plan, is that the reference that Your Honor is making? Then let's turn to the 1999 plan, and that would be ER 169. And counsel for Raytheon attempted to make the distinction between 8.1 and 8.2. And I'll address both. First, looking at 8.2, concerning the right to terminate, it indicates about halfway down. The company reserves the absolute and unconditional right to terminate the plan and any and all benefit programs, in whole or in part, with respect to some or all of the employees. Now, again, this is language drafted by Raytheon. If they had intended to reserve this right to terminate with respect to retirees, then they could have put that. Of course, the union and the retirees had no control over what they drafted. But we believe, and this is a subject... But what about number 8.1, which talks about they have the right to amend the plan and any or all benefit programs, including the right to reduce or eliminate benefits provided? And retirees take exception to the claim that the elimination of their company paid medical benefits was done under 8.1 and not 8.2. Why? Well, because their benefits up until July 1, 2004, were company paid benefits that had been promised under collective bargaining agreements dating back to 1972. Beginning July 1, 2004, the right to company paid benefits ended. They were terminated. From there on until the district court ruled in August of 2008 to reinstate those benefits, the retirees had to pay each month for those benefits that previously had been provided. Altogether or partially? All. For all their benefits, they had to pay. They made it entirely. There was a $256 a month contribution made by Raytheon. However, the difference, which was substantial, had to be made up by the retirees. These plans often... Not entirely. I'm sorry? So not entirely. No, except for $256 contribution from Raytheon. But the point I want... It's not that they weren't terminated. It's that they've amended the terms. Well, in other words, you still have all your coverage. The term is now you don't get it for what you used to. You now have to pay whatever the cost to us is. Which is assuming whether or not the retirees could even afford to maintain the coverage. And I understand that totally, the problem. But I'm just looking at the language here, which is it seems that the right to terminate is... To give meaning to 8.2, you have to give meaning to 8.1 generally and read them together. Right. As having different meanings. Correct. And perhaps the important point here is even if we accept the notion that what happened to the retirees on July 1, 2004 was an amendment, not a termination, Raytheon didn't exercise that amendment until July 1, 2004. Retirees who had retired under the previous collective bargaining agreements, whether those agreements were signed in 90, 93, 96, or 99, when they retired under those agreements, they retired with vested rights. Ultimately, when Raytheon exercised its right to amend or terminate, whichever phraseology we accept, then at that point, their amendment or termination became effective, but not retroactively. And that's their argument, is that we can go back, Raytheon, we can go back and undo vested benefits, benefits that have been promised to the retirees under the collective bargaining agreements that would be company paid until age 65. Now, I want to go back to... Well, but if you're not really going back, if the plans for the 99 and the 2003 plan contain the same right to amend, right to terminate, correct? That's correct, Your Honor. Okay. But they don't because they have an exception for the collective bargaining agreement. Correct. And that's why there's, it seems to me, a divide between the 90 and 97 plans and the 99 and 2003 or 4. I mean, there's two different languages to be interpreted here, and I recognize you'd like us to interpret them the same, with the same result. Yes, but even acknowledging, which we must because the language is obvious, that the 99 and 97 plans' language concerning termination and amendment are different than the prior plans, even acknowledging that Raytheon didn't exercise that right until July 1st of 2004. They cannot go back, it's our contention, and undo benefits that had vested. But what, I don't understand that argument, okay? Just, so help me out with it. Sure. Of course, the term vesting I always have a little problem with when you're talking about medical benefits and people do use, or people, I mean, documents do use those terms and so do lawyers. Okay. Where does it say if you retired and the 99 or 2003 plan were in effect at the time of your retirement, and then Raytheon went in under 8.1, what language would I look to to support your argument to say you can't do that? If I may direct your honor to, well, let's go ahead and look at the 1999 collective bargaining agreement, since that would speak to the later plans. Okay. If we look at Article 12, which is beginning at ER 151, this is the language of the collective bargaining agreement. And incidentally, this was the first post-merger collective bargaining agreement between the union and Raytheon. And Raytheon simply adopted what had been provided in earlier collective bargaining agreements. It reads there at the bottom of ER 151 Section D, retiree employees' medical benefits for employees who hereafter retire with at least three years of continuous participation in the contributory option of the retirement plan, immediately preceding the employee's date of retirement, and who are at least 55 and not less than 65, and who have five more years of continuous employment. The employer agrees to continue to provide the comprehensive medical plan coverages for which they were covered while active employees until the retired employee attains age 65. Now, that language itself is important because counsel made an erroneous reference in his argument to the multiple subordination clauses, as he called it. Article 12, and we'll just stay with a moment here in the 1999 collective bargaining agreement. On ER 149, Article 12, group benefits, discusses the various benefit plans available to active employees. Section A, which counsel hearkened to in support of the subordination clause, is for employee and dependent medical coverage. And it's important that it notes in there that this particular provision in Number 3, Section A, Number 3, the employer agrees during the term of this agreement to offer the employees this plan. If we turn the page and go over to the next benefit, actually over to ER 151, Section B, the next group benefit, basic life insurance plan, it says in Number 1, the employer agrees that during the term of this agreement. And we'll skip Section B for just a moment and come back to that. The other plans that are referenced in Article 12, for example, over on ER 154, optional group life insurance, the employer agrees during the term of this agreement to continue to make available optional group life insurance. Vision care is not contained in the record, but that vision care was also one of the benefits. Again, it said during the life or the term of this agreement. However, the one exception to that is Section D, retired employees' medical benefits. And in that case, it's not limited to the term of the agreement. It's allowed to continue until the employees reach age 65. And I better make one point real quickly because my time is up. Your Honors addressed extrinsic evidence briefly. If it had been considered, if the Court considered this argument or the plans unambiguous, the extrinsic evidence clearly shows that Raytheon intended and communicated to the retirees. Does the summary plan description have a reservation clause in it? The summary plan description? I do not believe so, Your Honor. Then you also had, I gather, some sorts of other communications. The communications that were given to the employees annually, your retirement guide, which indicated you would have, you are eligible for company-paid medical benefits until age 65 and your spouse as well. And then upon retirement, on the retirement date within that week, they were given a letter, and it says in that letter, and this is in the record, S.E.R. 5-8, I believe, that now that you are retiring, you are also eligible for company-paid. Do you know the Bauer v. Funker Hill case? Yes, I'm familiar with that. And wasn't there a remand there for extrinsic evidence, essentially? You know, I don't recall, Your Honor, to be quite honest, if the remand was for extrinsic evidence. But it's our contention, and I don't want to exaggerate, that the court, the district court, did not need extrinsic evidence in this case to find that the collective bargaining agreements, the language, was clear and unambiguous. But we're looking at this de novo on a contract interpretation. But we're looking at it de novo. Do we get to look at the extrinsic evidence ourselves? Or is the extrinsic evidence in the record at this point? It is. And it's our contention, Your Honors, that you do get to look at the extrinsic evidence to the extent that you birate the argument that the contract is unambiguous. Ambiguous. Excuse me. Ambiguous. And so the argument is not that it's ambiguous. It's that it's unambiguously in their favor. Well, that's the one point. We thought the truth was somewhere in between. Would we look at the extrinsic evidence? And it's our contention that the law permits you to do that. Thank you, Your Honors. You may have two minutes for rebuttal. I very much appreciate that, Your Honor. Two quick points. It was interesting that Mr. Gregory started with the reservation of rights provision. I think implicitly that shows that he is not following the district court's reasoning that you begin and end with the CBAs. You don't even have to get to the reservation of rights provision. It was starting there because that's where you started. I'm sorry? I think it was starting there because that's where you started. He was following the rule of appellate lawyers, which is you pick up where was the last one left. Fair enough. But I guess the real point here is that with respect to the 94 and 97 reservation of rights provisions, Your Honors have, I think, very appropriately pointed out you can't just lump all the plans together. There's two different categories of plans, the 94 and 97 and the 99 and 03. It isn't a continuous loop, Your Honor, for this reason. The except is provided in the CBA. It doesn't say except for any benefit provided in the CBA. It says the employer reserves the right to modify or terminate except as provided in the CBA. Well, nothing in the CBA limits the right to modify or terminate. To the contrary, in J-4, again at ER-119, the CBA gives us a rule of construction that says the plan controls. I have such a hard time with that because it says the employer, again, with regard to the active employees, the employer agrees to pay the premiums for a basic life, comprehensive medical, temporary disability and vision care coverage. Agrees to pay the plan and so on. And then with regard to the retirees, it says whatever it says. And you're saying that although it says it, this kind of sneaky provision that is a back to the plan trumps all that. That's your basic argument. Please, it's not sneaky because it's right there on the face of it. I mean, these are negotiations. But it's certainly not clear. In other words, when you say that you agree to pay the premiums, but I don't really – I'm not really promising to pay the premiums. Well, Your Honor, again, but I mean, again, that's J-1 and J-2. J-4, which I was just going to get to in terms of the kind of rambois from the reservation of rights, J-4 has a good – a very important rule of construction that says the plan will control except as specifically – and the word specifically is provided there in the CBA. So what the CBA is really telling us is that, look, we're not going to get into the nitty-gritty. We're giving – we're going to pay your premiums, but all of the benefits we're talking about here are subject to the – The benefits, but not the promise to pay. Well, again, Your Honor, but then it goes into a different issue with respect that if you start separating promise to pay from benefits, then they don't even get through the front door in D-1. But my only point is that the loop is broken by J-4 with respect because that says it's got to be specific, and nothing in the CBA has any – does not speak to the right to amend or terminate. They say that the – that just the conferral of benefits itself implicitly governs that. But implicit is not good enough under J-4. And, in fact, the Brushy Creek case from the Seventh Circuit and the Crown Cork and very similar reservation of rights language that sent you back to the CBA. And in both cases, those courts of appeals held that it was unambiguous. So in the end, this just – it's solely a contract interpretation problem. Is that right? Yes, Your Honor. Okay. And the other – on extrinsic evidence, can I make one? Yes. One last point. Indulgence. I apologize. It's – certainly an appellate court in the first instance should not be construing extrinsic evidence. They won on summary judgment, so it's very strange for them to say you've got to look at extrinsic evidence, and their extrinsic evidence, in fact, you have to be very careful because they've cherry-picked that. At SER 14, there's a reservation of rights provision that they didn't quote in the very letter that they're talking about. And this is a fact-intensive thing that the district court never looked at that. And if you were to think that that were relevant, you'd have to remand with respect. But the record is complete, isn't it, because the issue – the extrinsic evidence issue was raised on summary judgment, was it not? It is, Your Honor. If you start to – it's not in the J.A. or the E.R.'s, but with respect, I think the appropriate thing to do is say the district court erred by granting summary judgment, and then, again, we think you can rule in our way as a matter of law. At the very least, I think the normal way of appellate procedure would be, if you start to need to look at facts and extrinsic evidence in the first instance, to let the district court do that in the first instance. Was discovery closed at the time of the summary judgment or not? My impression is yes, Your Honor. There was discovery, and my understanding is yes. But also the – so if you – if the record is complete as to extrinsic evidence, if we found a conflict in the extrinsic evidence, then, yes, we would need to remand for a trial, but if we thought the extrinsic evidence one way or another met the summary judgment standard, then we wouldn't have to remand. I guess that's right, Your Honor. I guess what I'm just saying is please be very careful when you look at the extrinsic evidence, because, for instance, the plaintiffs in their SER have attached certain selected portions of documents from there, but there are specific reservations of rights provisions in SPDs, even in retirement guides. Okay. We have your points in mind. Thank you very much, Your Honor. I appreciate it. The case just argued, Alde v. Raytheon, is submitted. Thank you, all counsel, for your arguments. The briefing is quite detailed and helpful, and we will hear from us in due course. Thank you.
judges: Thompson, McKeown, Berzon